IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | |
|---|---|
| KEVIN C. BYRD, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | CIVIL ACTION NO. 2:08cv67-SRW |
| ) | (WO) |
| MICHAEL J. ASTRUE, Commissioner ) | |
| of Social Security, ) | |
| ) | |
| Defendant. ) | |

**MEMORANDUM OPINION**

Plaintiff Kevin C. Byrd brings this action pursuant to 42 U.S.C. § 405(g) and § 1381(c)(3) seeking judicial review of a decision by the Commissioner of Social Security ("Commissioner") denying his application for disability insurance benefits and supplemental security income under the Social Security Act. The parties have consented to entry of final judgment by the Magistrate Judge, pursuant to 28 U.S.C. § 636(c). The court concludes that the decision of the Commissioner is due to be reversed.

**BACKGROUND**

On August 11, 2005, plaintiff filed applications for disability insurance benefits and supplemental security income. On January 8, 2007, after the claim was denied at the initial administrative levels, an ALJ conducted an administrative hearing. The ALJ rendered a decision on June 27, 2007. The ALJ concluded that plaintiff suffered from the severe impairments of hypertension and seizures. (R. 23). He found that plaintiff's impairments, considered in combination, did not meet or equal the severity of any of the impairments in

the "listings." He further determined that plaintiff could no longer perform his past relevant work, but retained the residual functional capacity to perform jobs existing in significant numbers in the national economy. Thus, the ALJ concluded that the plaintiff was not disabled within the meaning of the Social Security Act. On December 14, 2007, the Appeals Council denied plaintiff's request for review.

## STANDARD OF REVIEW

The court's review of the Commissioner's decision is narrowly circumscribed. The court does not reweigh the evidence or substitute its judgment for that of the Commissioner. Rather, the court examines the administrative decision and scrutinizes the record as a whole to determine whether substantial evidence supports the ALJ's factual findings. Davis v. Shalala, 985 F.2d 528, 531 (11th Cir. 1993); Cornelius v. Sullivan, 936 F.2d 1143, 1145 (11th Cir. 1991). Substantial evidence consists of such "relevant evidence as a reasonable person would accept as adequate to support a conclusion." Cornelius, 936 F.2d at 1145. Factual findings that are supported by substantial evidence must be upheld by the court. The ALJ's legal conclusions, however, are reviewed *de novo* because no presumption of validity attaches to the ALJ's determination of the proper legal standards to be applied. Davis, 985 F.2d at 531. If the court finds an error in the ALJ's application of the law, or if the ALJ fails to provide the court with sufficient reasoning for determining that the proper legal analysis has been conducted, the ALJ's decision must be reversed. Cornelius, 936 F.2d at 1145-46.

## DISCUSSION

Plaintiff was treated by Dr. McWhorter for hypertension between 2000 and 2004.

(Exhibits 1F, 3F). On February 14, 2005, during a visit to Colorado, plaintiff reported to the emergency room complaining of high blood pressure and an increased heart rate. A urinalysis was positive for cocaine, and plaintiff was discharged with a diagnosis of cocaine-induced hypertension and tachycardia and prescription for Valium. (Exhibit 2F). On Monday, July 11, 2005, plaintiff sought treatment from Dr. McWhorter for dizziness and lightheadedness. He reported that he had experienced a seizure the previous Friday, and questioned whether his blood pressure medications were working. Dr. McWhorter's assessment included "rule out seizure disorder" and "[h]ypertension, poorly controlled, probably causing seizure activity[.]" (R. 114). On August 23, 2005, plaintiff again complained of having a seizure. (R. 111). On a form he completed to assist plaintiff with receiving emergency cooling and energy assistance, Dr. McWhorter reported that plaintiff had seizure disorder and chronic hypertension and that his medical condition would be "severely aggravated by extreme hot or cold weather[.]" (R. 113).

On November 7, 2005, plaintiff sought treatment from Dr. Joseph Johnson at Red Level Clinic, explaining that was transferring his care from Dr. McWhorter because he could not afford to buy medicine. He told Dr. Johnson that he had a seizure one week previously. Dr. Johnson diagnosed seizure disorder and hypertension and prescribed Lotrel and Dilantin from "patient assistance." (R. 127). Plaintiff returned for a follow-up appointment on December 6, 2005; Dr. Johnson dispensed Lotrel and Dilantin from patient assistance. (R. 126). In February 2006, plaintiff complained of back pain due to a fall during a seizure two weeks previously. Dr. Johnson noted "hypertension in poor control" and "seizure disorder

3

with recurrent seizures – it appears that he is having about 1 per month[.]" Although plaintiff indicated that he was taking three Dilantin each night, his blood Dilantin levels were "undetectable." (R. 142-43). Plaintiff returned for follow-up on March 7, 2006; Dr. Johnson continued plaintiff on his medications. Dr. Johnson completed a form indicating that plaintiff suffers generalized convulsive seizures approximately monthly. (R. 130, 142). On April 27, 2006, plaintiff reported that he had a seizure a few days previously, even though he was taking Dilantin. (R. 141). In visits on May 25th and June 26th, plaintiff reported no additional seizures. (R. 139-40). On July 4, 2006, plaintiff was admitted to the hospital for one week for pancreatitis. He had evidence of marijuana, amphetamines, and barbiturates in his urine. On July 17, 2006, plaintiff told Dr. Johnson that he had not been using alcohol or drugs since he had been released from the hospital. Dr. Johnson warned plaintiff that amphetamine use could make his seizures worse. (R. 138). Plaintiff did not report any additional seizures in monthly office visits in August, September and October 2006. (R. 135-37).

At the administrative hearing on January 8, 2007, plaintiff testified that he was 35 years old and had previously worked as a welder. (R. 157-58). He testified that his first seizure occurred at his workplace, and that his coworkers told him that he fell, hit his head, and had a seizure. Plaintiff stated that he was hospitalized for two days. (R. 159). He had another seizure at his home about a month later. (R. 161-63). Plaintiff further testified that he had two seizures per month during 2005, while he was seeing Dr. McWhorter and receiving medication. (R. 164). Plaintiff testified that his medications do not completely

4

control his seizures. (R. 165). The ALJ determined that an EEG was necessary for adjudication of the claim. He stated that he would reconvene the hearing after the EEG, and that plaintiff should be prepared to present a witness to substantiate his seizures. Plaintiff's attorney indicated that plaintiff's wife was then present, and that he would bring her to give testimony regarding plaintiff's seizures. (R. 165, 169).

On February 7, 2007, plaintiff reported to Dr. William Watson, a neurologist, for a consultative examination. He told Dr. Watson that his most recent seizure had occurred one month previously, and the next most recent occurred six weeks before that, and that he was on his medications at the time of the seizures. Dr. Watson observed "no electrophysiological evidence of epileptiform activity or persistent focal abnormality" on plaintiff's EEG. However, he noted that the history of seizures "seems legitimate," and that the "[a]bsence of epileptiform activity on an EEG does not rule out the possibility of an underlying tendency towards seizures." He concluded:

> There are no physical findings today that restrict activities regarding sitting, standing, lifting, carrying, etc. The tendency toward seizures restricts activities that might prove dangerous to him if a seizure occurs during that particular activity. Therefore there is restriction regarding climbing to high levels creating a risk for falling, restriction for operating motorized vehicles, and restriction related to being around standing water without attendance. Other restrictions should be determined as presented. Machinery in motion would be hazardous if a seizure occurs.

(R. 146-47). Dr. Watson completed a medical source opinion form, in which he indicated no exertional limitations. (R. 149). He indicated that plaintiff can balance only occasionally. (R. 150). He noted that plaintiff is limited to occasional exposure to extreme heat or cold, fumes, noxious odors, dust, mists, gases or poor ventilation; that he should never drive

5

automotive equipment or work in high, exposed places, or in proximity to moving mechanical parts; and that he may frequently be exposed to wetness/humidity and vibration. Dr. Watson wrote that he had completed the form based on plaintiff's severe history, and reiterated that the physical findings were not remarkable. (R. 151).

The ALJ issued his decision on June 27, 2007, without reconvening the hearing. He found that plaintiff suffers from severe impairments of hypertension and "seizures." (R. 23). He found plaintiff's testimony to be only partially credible, stating:

> [W]hile it is credible that the claimant experiences some symptoms resulting from his impairments, it is not credible that he experiences the level of symptomatology to the extent alleged. The record suggests that the frequency, duration, and sequelae of the claimant's seizure episodes are minimized and the condition is controlled when his medication levels are regularly monitored and he takes his medications as prescribed. Treatment records from Dr. Johnson through October of 2006, noted that claimant's last self-reported seizure activity occurred in April of 2006, although there is no medical evidence to substantiate the validity of this activity.

R. 26). The ALJ stated that he assigned "determinative weight" to Dr. Watson's findings and opinions. He stated, "In sum, Dr. Watson opined there were no physical findings that restricted activities regarding sitting, standing, lifting, carrying, etc. Restrictions placed on the claimant included climbing to high levels, operating motor vehicles and being around standing water without attendance – all secondary to seizure disorder." (R. 26). As to plaintiff's residual functional capacity, the ALJ stated:

> Given the credible medical opinions highlighted above, coupled with the objective findings in terms of the claimant's neurological functioning, and his strength, gait, and range of motion, the Administrative Law Judge finds that the claimant possesses the residual functional capacity to perform sedentary work as defined herein.

(R. 26).  The ALJ found that the requirements of plaintiff's previous work as a welder exceeded his residual functional capacity.  He concluded:

> Based on a residual functional capacity for the full range of sedentary work, considering the claimant's age, education, and work experience, a finding of "not disabled" is directed by Medical-Vocational Rule 201.29.

(R. 27).

Plaintiff argues – taking the ALJ's RFC finding at face value – that the ALJ erred by failing to find that plaintiff suffers from nonexertional limitations and, accordingly, by relying on the "grids" to support his Step 5 finding that there are a significant number of jobs existing in the national economy which plaintiff can perform.  (Doc. # 13, pp. 8-9).  The Commissioner responds that since "the ALJ specifically stated that he was giving determinative weight to the limitations recommended by Dr. Watson," the ALJ implicitly included the non-exertional limitations recommended by Dr. Watson.  The Commissioner characterizes the ALJ's failure to "expressly include any non-exertional limitations in the RFC" as an "opinion writing deficiency [which] does not necessitate remand."  (Doc. # 16, pp. 6-7).  The court concludes that, whether the ALJ's RFC assessment is as the ALJ expressly states in his opinion (including no nonexertional limitations) or as argued by the Commissioner (implicitly including the nonexertional limitations indicated by Dr. Watson), the decision is due to be reversed.

The ALJ found that plaintiff suffers from the severe impairment of "seizures."  The only detailed medical source opinion regarding plaintiff's limitations resulting from his seizure disorder is from Dr. Watson, the neurologist who performed the consultative

7

examination.[1]  Dr. Watson indicates that plaintiff has no exertional limitations, but several nonexertional limitations.  There is no contrary medical opinion in the record.   While the ALJ claims to have given Dr. Watson's opinion "determinative weight," the ALJ – at least expressly – concluded that plaintiff's severe impairments of seizures and hypertension cause only exertional limitations to sedentary work.[2]  Accordingly, the court concludes that the RFC assessment expressed by the ALJ is not supported by substantial evidence of record.[3]

Even if the ALJ implicitly included nonexertional limitations in plaintiff's RFC, as argued by the Commissioner, the decision is due to be reversed.  The Commissioner acknowledges that the ALJ is required to "determine whether the claimant's non-exertional limitations significantly reduce the occupational base for the found exertional level of work" and that, if the claimant's non-exertional impairments significantly limit his basic work skills, the ALJ may not rely exclusively on the "grids."  The Commissioner then argues that

---

[1] Dr. Johnson expressed his opinion regarding plaintiff's limitations only in the context of seeking cooling and energy assistance for the plaintiff.  He indicated that plaintiff's medical condition would be "severely aggravated by extreme hot or cold weather[.]"   (R. 113).

[2] The ALJ's conclusion that the "grids" *direct* a finding of "not disabled" suggests that the ALJ did not, as argued by the Commissioner, implicitly include nonexertional limitations in plaintiff's RFC.  See SSR 83-14 ("No table rule applies to direct a conclusion of "Disabled" or "Not disabled" where an individual has a nonexertional limitation or restriction imposed by a medically determinable impairment.  In these situations, the table rules are used, in conjunction with the definitions and discussions provided in the text of the regulations, as a framework for decisionmaking.").

[3] The court rejects the Commissioner's argument that the ALJ's failure to conduct a supplemental hearing to take testimony from witnesses to plaintiff's seizures is immaterial because the ALJ found – obviating the need for such testimony – that plaintiff suffers from a seizure disorder.  (See Commissioner's brief, Doc. # 16 at p. 10).  Lay witnesses could have testified as to observable symptoms of the "severe" seizure disorder.  This testimony may have affected the ALJ's determination regarding plaintiff's nonexertional limitations and his assessment of the credibility of plaintiff's testimony regarding his symptoms.  Plaintiff's counsel advised the ALJ that plaintiff's wife would be called to testify at the supplemental hearing, and the ALJ assured plaintiff that another hearing would be conducted.  (R. 169).

"[a]lthough the ALJ failed to state whether Plaintiff's non-exertional limitations (i.e., no climbing to high levels, operating motor vehicles, or being around water without attendance) significantly compromised his capacity for sedentary work (Tr. 27), the ALJ's failure to do so is harmless" because "these non-exertional limitations would not have a significant impact on the full range of sedentary work." (Doc. # 16, p. 8).[4] In other words, the Commissioner invites the court to find – as a matter of administratively noticed fact – that the non-exertional limitations indicated by Dr. Watson would not significantly erode the occupational base of unskilled sedentary work which plaintiff is able to perform. The court declines to do so. The Commissioner's argument is premised, in part, on language in SSR 96-9p and SSR 85-15.[5]

---

[4] The Commissioner's argument includes most of the nonexertional limitations included in Dr. Watson's written report (see R. 147), but does not address the additional environmental limitations which Dr. Watson included on the accompanying Medical Source Opinion (Physical) form (see R. 151).

[5] In pertinent part, SSR 96-9p states:

> In general, few occupations in the unskilled sedentary occupational base require work in environments with extreme cold, extreme heat, wetness, humidity, vibration, or unusual hazards. The "hazards" defined in the SCO are considered unusual in unskilled sedentary work. They include: moving mechanical parts of equipment, tools, or machinery; electrical shock; working in high, exposed places; exposure to radiation; working with explosives; and exposure to toxic, caustic chemicals. Even a need to avoid all exposure to these conditions would not, by itself, result in a significant erosion of the occupational base.

SSR 96-9p, *Policy Interpretation Ruling Titles II and XVI: Determining Capability To Do Other Work – Implications of a Residual Functional Capacity for Less Than a Full Range of Sedentary Work.* The Commissioner further relies on language in SSR 85-15, *Titles II and XVI: Capability to Do Other Work – The Medical-Vocational Rules as a Framework for Evaluating Solely Nonexertional Impairments:*

> A person with a seizure disorder who is restricted only from being on unprotected elevations and near dangerous moving machinery is an example os someone whose environmental restriction does not have a significant effect on work that exists at all exertional levels.
>
> Where a person has a medical restriction to avoid excessive amounts of noise, dust, etc., the impact on the broad world of work would be minimal because most job environments do not involve great noise, amounts of dust, etc.

9

However, these Social Security Rulings do not – in the context of the limitations imposed by Dr. Watson – permit a conclusion, without resort to written vocational reference materials or the assistance of a vocational expert, that the unskilled, sedentary occupational base has not been significantly eroded. For example, Dr. Watson found that plaintiff may only occasionally be exposed to "fumes, noxious odors, dust, mists, gases or poor ventilation." (R. 151). SSR 96-9p states:

> [R]estrictions on the ability to work in a noisy workplace must be evaluated on an individual basis. The unskilled sedentary occupational base may or may not be significantly eroded depending on the facts in the case record. In such cases, it may be especially useful to consult a vocational resource.
>
> *Restrictions to avoid exposure to odors or dust must also be evaluated on an individual basis. The RFC assessment must specify which environments are restricted and state the extent of the restriction; e.g., whether only excessive or even small amounts of dust must be avoided.*

SSR 96-9p (emphasis added).[6]

If, as the Commissioner argues, the ALJ implicitly adopted the nonexertional limitations set forth in Dr. Watson's report and physical RFC form, the ALJ was then

---

> Where an individual can tolerate very little noise, dust, etc., the impact on the ability to work would be considerable because very few job environments are entirely free of irritants, pollutants, and other potentially damaging conditions.
>
> Where the environmental restriction falls between very little and excessive, resolution of the issue will generally require consultation of occupational reference materials or the services of a VS.

SSR 85-15.

[6] Additionally, as argued by the plaintiff, these Social Security Rulings conflict in certain respects with the Commissioner's regulations. See Williams v. Halter, 135 F. Supp. 2d 1225 (M.D. Fla. 2001)(("[L]ike SSR 85-15, SSR 96-9 overlooks the fact that the Secretary's own regulations states that approximately 85 percent of the unskilled sedentary jobs existing in the national economy are in the machine trades and benchwork occupational categories.")(citing 20 C.F.R. Pt. 404, Subpt. P, App. 2, § 201.00(a)).

required – before relying exclusively on the "grids" to support his Step 5 decision – to make a finding regarding whether plaintiff's nonexertional limitations are severe enough to preclude a wide range of employment at the unskilled, sedentary level.  See Sryock v. Heckler, 764 F.2d 834, 836 (11th Cir. 1985)("[W]hen both exertional and nonexertional limitations affect a claimant's ability to work, the ALJ should make a specific finding as to whether the nonexertional limitations are severe enough to preclude a wide range of employment at the given work capacity level indicated by the exertional limitations."); see also Phillips v. Barnhart, 357 F.3d 1232, 1243-44 (11th Cir. 2004)("The ALJ must address and resolve this issue before relying on the grids.  Because the ALJ did not address this issue, we remand this case to the Commissioner so that the ALJ may consider whether Phillips's nonexertional limitations significantly limit her basic work skills at the sedentary work level.").  Since the ALJ made no such finding in the present case, his Step 5 conclusion regarding other work plaintiff can perform is not supported by substantial evidence.[7]

## CONCLUSION

For the foregoing reasons, the Commissioner's decision is due to be REVERSED and this action REMANDED for further proceedings consistent with this Memorandum Opinion. A separate judgment will be entered.

Done, this 23rd day of June, 2009.

/s/ Susan Russ Walker
SUSAN RUSS WALKER
CHIEF UNITED STATES MAGISTRATE JUDGE

---

[7] The court does not intend, by this decision, to express any opinion on the ultimate issue of whether plaintiff is disabled within the meaning of the Social Security Act.

11